MARISSA M. FRANCO (SBN 296793)
mfranco@fisherphillips.com
 FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, California 92614
Telephone: (949) 851-2424
Facsimile: (949) 851-0152

Attorney for Plaintiff
CHARLES SCHWAB & CO., INC.

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – RIVERSIDE DIVISION

| | |
|---|---|
| CHARLES SCHWAB & CO., INC., | Case No.: 5:25-cv-03338 |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | |
| DAVIES FINANCIAL ADVISORS, | 1. **MISAPPROPRIATION OF TRADE SECRETS - DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 et seq.);** |
| Defendant. | 2. **TORTIOUS INTERFERENCE WITH CONTRACT;** |
| | 3. **TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS;** |
| | 4. **STATUTORY AND COMMON LAW UNFAIR BUSINESS PRACTICES;** |
| | 5. **CIVIL CONSPIRACY** |

Plaintiff, Charles Schwab & Co., Inc. ("Schwab"), brings the following Complaint seeking damages and injunctive relief against Defendant, Davies Financial Advisors ("DFA" or "Defendant"), and in support states as follows:

1
COMPLAINT

FP 60716887.1

1
## PRELIMINARY STATEMENT

2      This action arises from Defendant DFA's knowing misuse of Plaintiff
3 Schwab's confidential and trade secret client information to divert well over $85
4 million in client assets that Schwab entrusted to its former Financial Consultant, Brett
5 Griffin, for servicing on Schwab's behalf. Schwab, a national broker-dealer, invested
6 substantial resources to develop and protect its client relationships and nonpublic
7 personal information, and it provided Griffin with access to that information and with
8 valuable benefits in exchange for his commitment not to use or disclose its trade
9 secret client information.

10      Instead of honoring his contractual and statutory obligations, Griffin (while
11 still employed by Schwab and then as DFA's registered Investment Adviser
12 Representative) secretly positioned himself and DFA to solicit Schwab's clients
13 using Schwab's protected client lists and nonpublic personal information, improperly
14 communicated with those clients through undisclosed personal channels, and misled
15 them about his continuing affiliation with Schwab and his authority to service their
16 Schwab accounts from DFA. Clients reported being confused about whether their
17 assets were still at Schwab, whether Schwab had authorized Griffin's outreach, and,
18 in at least one instance, whether they were being targeted by a scam.

19      Acting as DFA's agent, and for DFA's financial benefit, Griffin used Schwab's
20 trade secrets and confidential information to unfairly compete with Schwab, to
21 interfere with Schwab's contractual and business relationships, and to engage in
22 unlawful and unfair business practices, all while DFA denied responsibility and
23 continued to profit from the transferred business. Schwab brings this action under the
24 Defend Trade Secrets Act and related state-law claims to remedy DFA's misuse of
25 Schwab's trade secrets and confidential information, protect Schwab's client
26 relationships and goodwill from further irreparable harm, and obtain damages,
27 restitution, disgorgement, and injunctive and other equitable relief.
28 ///

FP 60716887.1

1
## PARTIES

2      1.      Schwab is a registered securities broker/dealer that had an office located

3  at 27580 Ynez Rd A, Temecula, California 92591 (the "Temecula Branch").

4      2.      DFA is a corporation organized and existing under the laws of the State

5  of California, with its principal place of business located at 25109 Jefferson Ave.,

6  Suite 205, Murietta, CA 92562.

7
## JURISDICTION AND VENUE

8      3.      The Court has subject matter jurisdiction over this action pursuant to 28

9  U.S.C. § 1331 because Schwab asserts federal claims against DFA under the Defend

10  Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq. The Court also has

11  supplemental jurisdiction over Schwab's remaining claims pursuant to 28 U.S.C. §

12  1367 because the claims form part of the same case or controversy as Schwab's

13  federal question claims under the DTSA.

14      4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2)

15  because it is a district within which a substantial part of the events or omissions

16  giving rise to Schwab's claims occurred.

17      5.      The Court has personal jurisdiction over DFA because it is a company

18  organized under the laws of the state of California with its principal place of business

19  in California.

20
## STATEMENT OF FACTS

21
### *Schwab's Business as a Broker-Dealer*

22      6.      Schwab is a securities broker-dealer that provides financial services to

23  individuals and institutional clients through two segments—Investor Services and

24  Advisor Services.

25      7.      With respect to the Investor Services segment, Schwab provides retail

26  brokerage, investment advisory, and other financial planning services to individual

27  investors.

28  ///

8.     With respect to the Advisor Services segment, Schwab provides custodial, trading, and support services to registered investment advisory firms ("RIAs"). Defendant DFA is an RIA.

### *Griffin's Role at Schwab*

9.     Griffin is a former Schwab Financial Consultant who worked in Schwab's Temecula Branch. As a Financial Consultant, Griffin's job was to work with clients assigned to him by Schwab to help them set financial goals, conduct financial planning, determine their financial strategies, and select financial services and products at Schwab. Griffin also partnered with other Schwab employees to provide clients with a variety of other services ranging from estate planning, to fixed income planning, to education and retirement planning.

10.     It bears emphasis that Griffin did not develop a "book" of business through cold calls, marketing efforts, or his own connections like brokers at other brokerage firms do. Instead, Griffin was assigned a practice of preexisting Schwab clients or qualified leads to service on behalf of Schwab. These clients have millions of dollars in assets in their accounts at Schwab.  Each year, they generate hundreds of thousands of dollars in revenues and profits.

11.     As noted above, Schwab is a broker/dealer that offers investment services and products and has approximately 35 million client brokerage accounts nationwide. Some of these clients are individual investors who have asset levels and needs extending beyond basic brokerage services. These are the types of clients that were assigned to Griffin for servicing.

12.     To enable Griffin to service its clients, Schwab provided him with access to its extensive client records and information, including clients' transactional histories, account types, account balances, asset allocations, income, liquid and total net worth, tax status, tax information, investment objectives, and other personal financial information. Schwab paid Griffin and provided him with an opportunity to develop, cultivate and maintain relationships with its clients.

FP 60716887.1

13.    There is no public source available from which Griffin, or any other individual or entity, such as DFA, could ascertain the identities and contact information of Schwab's clients, much less the high-net-worth clients Griffin serviced. The identities of the clients assigned to Griffin at Schwab are not generally known to third parties such as RIA firms like DFA who compete with Schwab.

14.    The identities, contact information and financial information of Schwab's clients are very valuable to competitors because this information identifies clients who generate significant revenues and who have demonstrated a need, desire, and ability to pay for financial services. Schwab's competitors, such as DFA, can unfairly benefit from this information because it enables them to target their financial products, services, and marketing efforts to a pre-selected elite group of clients without the need to spend the significant amount of time, money, and resources Schwab has spent to identify and develop such clients.

### *Griffin's Agreement with Schwab*

15.    As a condition of initial employment at Schwab, all employees who interact with clients are required to sign a confidentiality agreement. Like all such employees, Griffin executed a confidentiality agreement when he began employment with Schwab, and from time-to-time, he renewed his commitment by signing subsequent versions of those agreements.

16.    A true and correct copy of the agreement most recently executed by Griffin (in 2016) (hereafter, the "Agreement") as maintained by Schwab in its files, along with proof of execution, is attached as **Exhibit A** and incorporated herein by reference.

17.    Griffin's Agreement is supported by consideration and is fully enforceable. Griffin executed the Agreement in exchange for continued at-will employment with Schwab and the compensation and other benefits he received from Schwab, including the opportunity to participate in Schwab's compensation plans, which provide the opportunity for additional compensation above and beyond base

pay. In consideration of the covenants signed by Griffin, Schwab agreed to, and did, employ and compensate him, provide him with employment related benefits, and provide him with other good and valuable consideration including assigning him to service specific retail client account relationships, providing him with Schwab sales support, operational systems, research and investment recommendations, clearing and financial services, Schwab goodwill and reputation, and opportunities to develop relationships with Schwab clients.

18.    Griffin reaffirmed his commitment to comply with the Agreement when he signed his severance agreement in exchange for substantial consideration on December 12, 2023.

### Griffin's Commitment Not to Improperly Use or Disclose
### Schwab's Trade Secret Client Information

19.    Schwab's client list and related information is a trade secret. Specifically, the names of Schwab's clients, their identities as clients of Schwab, their contact information, and financial information concerning their accounts are entitled to trade secret protection under the federal trade secret statute. *See* Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (the "DTSA").

20.    The Agreement executed by Griffin mirrors, in part, his obligation under the DTSA. Specifically, Griffin promised not to use trade secrets, such as trade secret client information, to unfairly compete with Schwab, to identify Schwab's existing clients, or to facilitate the solicitation of Schwab's clients, whether for his own benefit, or for the benefit of a new employer. Agreement at ¶ 1. To ensure no ambiguity, the Agreement defines "Confidential Information" and "Trade Secrets" to include valuable information not generally known to third parties such as "the identities of clients as clients of Schwab; names, addresses, phone numbers, email addresses, account numbers or financial or personal information pertaining to Schwab clients." *Id.* at ¶ 2.

///

21.    In addition, it bears emphasis that the names, addresses and contact information of Schwab clients are also protected from disclosure as personally identifiable information under the Gramm-Leach-Bliley Act and its implementing federal regulations, commonly referred to as Regulation S-P. *See* 17 C.F.R. Part 248. Even the fact that an individual is a client of a specific financial institution—here, Schwab—is protected from disclosure under Regulation S-P. 17 C.F.R. § 248.3. These federal regulations underscore the highly confidential nature of financial services client information. For these reasons, Griffin agreed to comply with Regulation S-P. Specifically, paragraph 7 of Griffin's Agreement states as follows:

> My obligation to protect non-public personal information ("NPI") about Schwab customers is also governed by Regulation S-P. (See 17 C.F.R. §248.10(a)(1)). Regulation S-P prohibits Schwab from disclosing NPI about its customers to nonaffiliated third-parties. NPI includes, but is not limited to, Schwab customer names, addresses, telephone numbers, account information, and information that identifies an individual as a customer of Schwab. I understand that Schwab does not share customer NPI with nonaffiliated third-parties. Pursuant to Regulation S-P, I am also prohibited from sharing Schwab customer NPI with nonaffiliated third-parties, including a new employer (except as provided for in paragraph 10 of this Agreement). My non-disclosure obligations under Regulation S-P continue after my employment at Schwab ends.

22.    The books, files, and records of Schwab, the confidential information contained therein, and especially the data pertaining to Schwab clients, including clients' names and addresses, the clients' identities as clients of Schwab, as well as additional information such as clients' social security numbers, account numbers, financial status, financial statements, investment objectives and preferences, assets and/or securities held by these clients, practice metrics, and other highly confidential

personal and financial information concerning Schwab's clients, are trade secrets of Schwab subject to legal protection.

23.    Griffin's Agreement also contains his promise to return to Schwab all Schwab property and confidential information in his possession upon the end of his employment with Schwab. *Id.* at ¶ 6.

### *Griffin's Duty of Loyalty and his Social Media Obligations*

24.    Griffin's Agreement also specifies that "at all times during [his] employment," he owes Schwab "an unmitigated duty of loyalty" under which he "shall do nothing during [his] employment that [he] intend[s] or reasonably expect[s] to further [his] interests or the interests of [his] new employer to the actual or potential detriment of Schwab." *Id.* at ¶ 5.

25.    Given the high level of regulation in the securities industry, and Schwab's need to supervise its registered representatives, Schwab's policies and Griffin's Agreement also contain restrictions on his use of social media to communicate with clients. Namely, paragraph six of his Agreement contains his promise to disconnect from any clients with whom he was connected on LinkedIn immediately upon his departure from Schwab.

### *Griffin's Obligation Not to Communicate with Clients*
### *Via a Non-Schwab-Issued Device*

26.    Paragraph 15 of Griffin's Agreement provides that during his employment with Schwab, he was not permitted for personal or professional reasons to "(a) communicate with any clients (excluding personal communications with members of [his] family) via [his] home telephone and/or any mobile/cellular telephone not provided by [Schwab], and/or (b) provide any clients (excluding members of [his] family) with [his] home telephone number or the number of any non-[Schwab]-issued mobile/cellular telephone for purposes of contacting [him]." *Id.* at ¶ 15. The Agreement explains the important basis underlying this requirement: "Schwab has an obligation to supervise communications between its associated

8
COMPLAINT

persons and clients to ensure that they comply with FINRA's rules regarding client communications and to preserve the confidentiality of Confidential Information." *Id.*

### *Griffin's Departure From Schwab*
### *And His Subsequent Affiliation with DFA*

27. As part of a broader companywide reorganization, Schwab closed the Temecula Branch and Griffin's employment with Schwab ended effective January 5, 2024. Although Griffin was an at-will employee who could be terminated at any time, for any reason, or even no reason, Schwab notified Griffin of his impending separation on October 30, 2023. Schwab therefore provided Griffin with an approximately two-month notice period (the "Notice Period"). During his two-month Notice Period, Schwab continued to pay Griffin his regular base salary and continued to provide him with employment-related benefits. Schwab also offered Griffin, and Griffin accepted on December 12, 2023, a severance package that paid him a lump sum cash amount of approximately $100,000.00.

28. On January 10, 2024, Griffin became a registered Investment Advisor Representative of DFA in Murrieta, California.

29. Becoming a registered Investment Adviser Representative of DFA meant that Griffin operated at all relevant times under DFA's umbrella of regulatory structure, supervision, and oversight, and that DFA had the authority and obligation to direct, control, and monitor his client-facing activities. Being a registered Investment Adviser Representative is a regulatory prerequisite to providing personalized investment advice to clients, managing their accounts, and soliciting new advisory clients, and, upon information and belief, DFA hired and registered Griffin with the expectation that he would solicit, transfer, and service clients, specifically including former Schwab clients, on DFA's behalf. To provide personalized investment advice to clients and to manage their accounts, a financial services professional (like Griffin) is required under state and federal law to become an Investment Advisor Representative of the RIA on whose behalf they are providing

such services. A financial services professional (like Griffin) also must be an Investment Adviser Representative of an RIA to solicit new clients for advisory services. Consequently, by allowing Griffin to become a registered Investment Adviser Representative of DFA, and by sponsoring his registration, DFA knowingly and intentionally appointed, authorized and expected Griffin to engage in the conduct described in this paragraph.

### *Griffin Breached his Agreement and Duty of Loyalty to Schwab*
### *On Behalf of DFA*

30.    Acting in his capacity as DFA's registered Investment Adviser Representative, and with DFA's knowledge, supervision and for DFA's benefit, Griffin has engaged in misconduct and actively sought to divert—and has succeeded in diverting—clients and assets away from Schwab. Through his unlawful conduct undertaken on DFA's behalf, Griffin diverted more than $85 million dollars in assets under management from Schwab to be serviced by him at DFA, generating advisory fees and other compensation for DFA.

31.    On January 9, 2024, four days after Griffin's employment ended, and the day before he became DFA's registered Investment Adviser Representative, Schwab sent Griffin a letter that enclosed and discussed the requirements of his Agreement. A true and correct copy of this letter is attached as **Exhibit B** and incorporated herein by reference. The letter reminded Griffin about his legal obligations (including those concerning confidentiality and social media) and asked him to immediately return any documents and information concerning Schwab or its clients. *Id.* at p. 3. It further stated that if Griffin believed he was entitled to keep such documents and information, he should identify the materials he possessed so Schwab could assess his claim. *Id.* The letter further asked Griffin to provide a copy of the letter and Griffin's Agreement to his manager and the legal or compliance group at DFA so DFA could ensure his compliance with his obligations. *Id.* Upon information and belief, and as Schwab expects to establish upon further investigation and

COMPLAINT

discovery, Griffin provided the letter and Agreement to DFA, and DFA's management and/or compliance personnel reviewed them, and thus knew of his ongoing contractual and statutory obligations to Schwab. Neither Griffin nor DFA took any steps in response to this letter to curtail Griffin's solicitations of Schwab's trade secret customers or to ensure the return and non-use of Schwab's confidential and trade secret information.

32.    Upon information and belief, and as Schwab expects to establish upon further investigation and discovery, when DFA recruited and hired Griffin, Griffin told DFA that he had been assigned a profitable practice of high-net-worth Schwab clients and that he intended to move a substantial portion of that business to DFA.

///

33.    Upon information and belief, and as Schwab expects to establish upon further investigation and discovery, DFA hired Griffin with the hope and expectation that he would divert business from Schwab to DFA.

34.    DFA provided Griffin with the systems, e-mail addresses, phone numbers, forms, and marketing materials he used to contact Schwab clients, schedule meetings, collect their highly sensitive personal and financial information, and open new DFA advisory accounts, and DFA knowingly accepted and processed account transfer paperwork for Schwab clients solicited by Griffin.

35.    Upon information and belief, and as Schwab expects to establish upon further investigation and discovery, DFA's compliance and supervisory personnel monitored or had the ability to monitor Griffin's client outreach and new account activity, saw that he was onboarding former Schwab clients in volume and using client information derived from Schwab, and nevertheless allowed his conduct to continue.

36.    DFA directly benefited from Griffin's use of Schwab's trade secret and confidential information because the assets he diverted from Schwab generated

advisory fees and other compensation for DFA and its affiliate and increased the value of DFA's practices.

37.    By knowingly accepting the transferred Schwab client relationships and assets, failing to restrict or discipline Griffin after being placed on notice of his obligations to Schwab, and continuing to profit from the diverted business, DFA ratified and adopted Griffin's misconduct as its own.

38.    On February 13, counsel for Schwab sent Griffin a follow-up letter. A true and correct copy of this letter is attached as **Exhibit C** and incorporated herein by reference. This letter likewise outlined Griffin's legal obligations. However, this letter also expressed Schwab's concern about recent reports that Griffin had violated his legal and contractual obligations. Specifically, Schwab noted that it had received several reports that Griffin had: (1) mailed solicitation letters to clients asking to set appointments with them; (2) proactively made solicitation calls to clients to set appointments with them; and (3) solicited Schwab's clients by comparing Schwab's offerings with those of his new employer, DFA, for the purpose of diverting business from Schwab. *Id.* at p. 3. Schwab explained why this behavior was unlawful and asked that Griffin provide several assurances to Schwab that such behavior would cease and that he would abide by his Agreement. Griffin did not respond to this letter. Upon information and belief, this letter was also provided to DFA, thereby further placing DFA on notice that any continued solicitation of Schwab clients by Griffin using Schwab's trade secret information would violate his contractual and statutory obligations.

39.    On March 5, having received no response from Griffin, counsel for Schwab emailed Griffin, attached a copy of the February 13 letter, and requested that Griffin acknowledge receipt of the letter and respond. A true and correct copy of this email is attached as **Exhibit D** and incorporated herein by reference. Schwab offered Griffin a more than reasonable amount of time to respond and conveyed its hope that litigation could be avoided. Despite this additional outreach, neither Griffin nor DFA

provided any assurances, and DFA did not restrict, discipline, or terminate Griffin's solicitations of Schwab clients.

40.    The failure of both Griffin and DFA to respond to Schwab's multiple written overtures served to confirm Schwab's conclusion that Griffin, with DFA's knowledge and acquiescence, was breaching his Agreement and other legal obligations by using Schwab's trade secret client list and client information to unfairly compete with Schwab, to identify Schwab's existing clients, and to facilitate the solicitation of Schwab's clients for his own benefit and for the benefit of DFA. *See* **Exhibit A**.

41.    Schwab first learned of Griffin's misconduct during his Notice Period. For example, on December 28, 2023, while he was still employed at Schwab and being paid by Schwab, Griffin sent a text message to Andrea Ruiz, his branch manager using his personal (as opposed to Schwab-issued) cell phone. The text concerned client AR,[1] contained AR's full name and phone number, and implied that Griffin and had recently communicated with AR.  The content of this text message shows:

    a.  Griffin had Schwab's confidential and trade secret client information on his personal cell phone; and

    b.  Client AR knew, and had been using, Griffin's personal cell phone number to communicate with Griffin, thus making evident that it was Griffin's practice to communicate with clients via a non-Schwab telephone during his employment.

42.    Additionally, Schwab believes and therefore alleges that Griffin used LinkedIn during his Notice Period to communicate with clients. Schwab believes that Griffin posted his personal email address on LinkedIn so that clients could contact him directly and so that Griffin could circumvent his contractual, statutory, and

---

[1] To protect client privacy and confidentiality, client initials are used herein in place of full client names.

13
COMPLAINT

common law obligations to Schwab. Upon information and belief, Griffin did not disconnect from clients upon leaving Schwab as required by his Agreement. *See* Agreement at ¶ 6.

43. Griffin's misconduct continued after he left Schwab. Schwab received numerous reports from clients making clear that Griffin breached his Agreement, misappropriated and misused Schwab's trade secrets, and engaged in unfair competition. The following are merely some of the reports that Schwab has received:

   a. Client ST informed Schwab that Griffin proactively called and emailed her. ST shared one email with Schwab where Griffin discussed being ready to transfer ST's business from Schwab to DFA. To facilitate the transfer, Griffin sent ST two documents—the first titled "Pre-Consultation Questionnaire" and the second titled "Preliminary Data Questionnaire." Both these documents, as well as the text in the body of Griffin's email, sought significant amounts of highly sensitive and personal information. The Pre-Consultation Questionnaire sought a holistic overview of ST's financial life, and asked about her goals, values, and objectives. The Preliminary Data Questionnaire sought much more specific and detailed information. It asked ST for her driver's license number, date of birth, social security number, home address, occupation, and age; it requested a detailed accounting of her assets and liabilities (including bank accounts, brokerage accounts, insurance coverages, and sources of income); and it wanted information about ST's family, including ST's spouse's and children's driver's license numbers, dates of birth, and social security numbers. ST found this outreach by Griffin to be concerning. She told Schwab it was unwelcome, unusual, and suspicious. ST worried that she might be the victim of some kind of scam. Griffin's communication to ST was especially concerning because Griffin said "Some of this information

FP 60716887.1

we have, but some we don't.  It is pivotal that we get this information as soon as possible!"

b.  Client IH reported to Schwab that Griffin called and wanted to schedule a meeting with her. Further, IH told Schwab that Griffin confused her about his current employment status and affiliation with Schwab, as relating to his ability to service her accounts. Griffin told IH he could continue to service her account at Schwab even though he was now working at DFA.

c.  Client AN told Schwab that Griffin sent AN an email asking if AN would join him at DFA.

d.  Client JR reported that Griffin reached out and wanted to schedule a meeting.

e.  Clients WG and KM both reported that Griffin called them and left voicemail messages.

f.  Client GK told Schwab that Griffin had repeatedly contacted him.

g.  Client LW reported that Griffin called her to solicit her to move her accounts to DFA. LW told Schwab that Griffin said that many of his Schwab clients are transferring to DFA, and that LW could keep her assets at Schwab while Griffin nonetheless serviced them from DFA.

h.  Client BT reported that Griffin called her and confused her when he started talking about how he could move her assets over to DFA.

i.  Client BH told Schwab that she transferred to DFA because Griffin reached out to her. However, BH was also confused, and was not clear on if or how DFA was still affiliated with Schwab.

j.  Client SL reported that Griffin reached out and scheduled a meeting with him.  When SL and Griffin met, SL says that Griffin told him (falsely) that Schwab approved Griffin's outreach and approved of Griffin continuing to work with Schwab clients despite him now being

employed at DFA. SL reported that Griffin told him to unenroll his accounts at Schwab and start working with him at DFA. Griffin told SL it was in his best interest to leave Schwab because the fees at Schwab were higher than at DFA.

44.    Griffin would not have known to direct his solicitations at these clients but for his employment at Schwab where he was entrusted with confidential information, including clients' names, contact information and financial needs. Griffin was entrusted with this confidential information conditioned on compliance with his Agreement.

45.    All of Griffin's client solicitations and all of his uses of Schwab's confidential and trade secret client information were undertaken in his role as DFA's registered Investment Adviser Representative, using DFA's systems and for DFA's financial benefit, and therefore his actions were taken on behalf of DFA; accordingly, DFA is vicariously liable for his misconduct and directly liable for knowingly directing, encouraging, and ratifying that misconduct.

### *Schwab Takes Many Steps to Preserve the Confidentiality of its Client Information*

46.    The confidential and trade secret information entrusted to Griffin is extremely valuable for many reasons, including because it can be used by a competitor to divert profitable business from Schwab.

47.    Schwab takes many steps to protect the secrecy of its client information. For example, Schwab trains its registered representatives on their obligations to protect client information and, in addition to employing managers to monitor communications, Schwab utilizes a centralized management operation with managers responsible for monitoring outgoing correspondence to protect against the wrongful dissemination of proprietary and confidential information.

48.    In addition, Schwab's computer network and email systems are designed to flag outgoing emails that contain client information, and the use of fax

machines is restricted and monitored to prevent client information from being transmitted by fax. Further, passwords or other user authentication methods are required to access client records and information on the Schwab computer system. Schwab also blocks employees from using removable storage devices (such as thumb drives,) web-based file sharing services (such as DropBox,) and web-based personal email (such as Gmail and Yahoo Mail) on work desktop and laptop computers.

49.     Schwab has also adopted a Code of Business Conduct and Ethics (the "Code"). The Code includes a specific section concerning the confidentiality of client information, which in pertinent part provides that information concerning the identity of clients and their transactions and accounts is confidential. It notes that such information may be disclosed only under limited circumstances. The Code prohibits Schwab employees from disclosing client information to anyone or any firm outside of Schwab, with few exceptions that do not apply here. The Code also states that Schwab employees have the responsibility to safeguard proprietary information and comply with Schwab's confidentiality agreements, (*i.e.*, Griffin's Agreement) the terms of which are a condition of employment. Schwab further requires its employees to use passwords or other user authentication methods when accessing its computer systems and records and restricts such access to its business premises and tightly controlled remote computing channels.

50.     Finally, Schwab requires its employees to abide by policies concerning use of confidential information. This requirement was made known to Griffin when he applied for a job with Schwab. Specifically, Griffin executed an acknowledgement in connection with his employment application confirming his obligation to abide by Schwab's written rules and policies.

51.     As outlined above, Griffin breached his Agreement by using Schwab's trade secret client list and client information to unfairly compete with Schwab, to identify Schwab's existing clients, and/or to facilitate the solicitation of Schwab's clients for his own benefit and for the benefit of his new employer, DFA. He engaged

in an actionable misappropriation of Schwab's trade secrets. All of Griffin's misconduct was undertaken in his capacity as DFA's registered Investment Adviser Representative, at its behest, on its behalf, and DFA has profited from and is liable for his misconduct.

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS

## DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 et seq.)

52.    The allegations of Paragraphs 1 through 51 are incorporated herein by reference with the same force and effect as if set forth in full below.

53.    Data pertaining to Schwab's clients, including clients' names and addresses, as well as additional information such as clients' financial status, financial statements, investment objectives and preferences, and other highly confidential personal and financial information concerning Schwab's clients and the practice assigned to Griffin, are trade secrets of Schwab subject to protection under the DTSA, 18 U.S.C. § 1836 *et seq.* Schwab uses its trade secrets in interstate commerce as its clients are serviced by individuals across state lines and its products and services are provided and sold across state lines.

54.    This information is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. The identities of Schwab's clients *as clients of Schwab*, are not readily available to the public or to competitors. The strength, nature, and composition of the practices assigned to Schwab's employees are not readily available to the public or Schwab's competitors, including DFA. Schwab has spent significant and incalculable sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor.

55.    Schwab has taken more than adequate measures under the circumstances to maintain the secrecy of this information, as described herein.

///

FP 60716887.1

56.    The conduct described above constitutes an actual misappropriation of Schwab's trade secrets.

57.    DFA has acquired, through Griffin's disclosure and use on its behalf, and has itself used, Schwab's trade secret customer information without Schwab's consent, including by accepting and processing account transfers and advisory agreements for Schwab clients identified and solicited with that information. Griffin engaged in this conduct on DFA's behalf despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, a duty he owed and continues to owe Schwab as a former employee and registered representative of Schwab.

58.    Schwab has confronted DFA about this misconduct, but DFA has denied responsibility without explanation and has failed to take corrective action, even as it continues to retain and profit from the diverted client relationships and assets. DFA's conduct was willful and malicious, and DFA received great financial benefit as a result of its misconduct.

59.    DFA misappropriated Schwab's trade secrets through its agent, Griffin. DFA, including its management and compliance personnel, was on notice that Griffin's conduct constituted a breach of his Agreement and a disclosure and misappropriation of trade secrets under applicable law, yet failed and refused to curtail the unlawful activities of Griffin, who acted on its behalf. In fact, DFA has adopted and ratified Griffin's conduct by denying that his actions were improper, and profiting and continuing to profit from the wrongfully diverted client relationships and assets.

60.    Schwab has sustained injuries and damages as a proximate result of the conduct of DFA.

61.    Because of the foregoing, Schwab has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as

FP 60716887.1

present economic loss and other incalculable financial loss. Schwab has been damaged by this conduct in an amount to be determined at trial.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACT

### (For Interfering with Griffin's Agreement)

62.    The allegations of Paragraph 1 through 61 are incorporated herein by reference with the same force and effect as if set forth in full below.

63.    The Agreement executed by Griffin in 2016 is a valid and enforceable contract.

64.    DFA at all relevant times was aware of the existence of the Agreement and its terms or should have known about the Agreement and its terms, as part of standard pre-hire due diligence in the industry.

65.    Despite its knowledge of Griffin's Agreement and control over his actions as its registered Investment Adviser Representative, DFA failed to curtail Griffin's breaches. In fact, DFA ratified Griffin's breaches by stating that his actions were not improper and by continuing to support and profit from his improper solicitation of Schwab clients.

66.    Because DFA was on notice of Griffin's Agreement and his obligations thereunder, and because it has embraced Griffin's breaches being undertaken on behalf of and for its benefit, and because DA provided its resources to enable Griffin to engage in misconduct on its behalf, DFA tortiously interfered with Griffin's Agreement.

67.    DFA willfully, intentionally, and/or recklessly interfered with Griffin's performance and compliance with his Agreement, by, among other things, employing Griffin (or otherwise designating him as its agent) in a manner in which he was required and/or expected to breach the terms of his Agreement, and by allowing, aiding, encouraging, and causing him to breach his Agreement.

///

FP 60716887.1

68.     As Schwab expects to establish upon further investigation and discovery, DFA also provided Griffin with financial incentives and inducements intended to motivate him to breach his Agreement.

69.     DFA's conduct was improper and without privilege or justification.

70.     Schwab has sustained injuries and damages as a proximate result of DFA's conduct.

71.     Because of the foregoing, Schwab has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss. Schwab has been damaged by DFA's conduct in an amount to be determined at trial.

## COUNT III

## TORTIOUS INTERFERENCE WITH

## CONTRACTUAL AND BUSINESS RELATIONSHIPS

72.     The allegations of Paragraphs 1 through 71 are incorporated herein by reference with the same force and effect as if set forth in full below.

73.     Schwab had a reasonable expectation of continuing its contractual and business relationships with clients.

74.     DFA at all relevant times was aware of the existence of Schwab's existing and prospective continuing contractual and business relationships with its clients. In fact, these relationships are the very reason DFA continued in its efforts to divert business from Schwab to itself by and through its registered agent, Griffin.

75.     By and through its actions described herein, DFA tortiously interfered with Schwab's contractual and business relationships with its clients.

76.     In addition, and in the alternative to the trade secret claim stated above, to the extent any of the Confidential Information described above does not qualify for trade secret protection, DFA has tortiously interfered with Schwab's contractual and business relationships with its clients by and through the wrongful use and disclosure of Schwab's Confidential Information.

77.    DFA's conduct was improper and without privilege or justification.

78.    Schwab has sustained injuries and damages as a proximate result of DFA's conduct.

79.    Because of the foregoing, Schwab has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss. Schwab has been damaged by this conduct in an amount to be determined at trial.

**COUNT IV**

**STATUTORY AND COMMON LAW**

**UNFAIR BUSINESS PRACTICES**

80.    The allegations of Paragraphs 1 through 79 are incorporated herein by reference with the same force and effect as if set forth in full below.

81.    DFA's wrongful conduct alleged herein constitutes unlawful, unfair, and fraudulent business acts and practices under Business and Professions Code §§ 17200 et seq., California Financial Information Privacy Act (California Financial Code § 4050 et seq. including §§ 4052, 4052.5, 4053 and  4057), and Regulation S-P (including 17 C.F.R. §§ 248.3, 248.10) and common law, which unlawful, unfair and fraudulent business acts and practices have harmed Schwab and deprived it of significant business opportunities.

82.    Schwab has sustained injuries and damages as a proximate result of DFA's conduct.

83.    As a result of DFA's unfair competition, DFA has been unjustly enriched and has unlawfully and wrongfully derived and continues to derive profits and property from its acts of unfair competition. Schwab is entitled to, and the Court should issue, an order of restitution and the accounting for and the disgorgement of all wrongfully obtained property and profits.

84.    Because of the foregoing, Schwab has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as

22
COMPLAINT

FP 60716887.1

present economic loss and other incalculable financial loss. Schwab has been damaged by this conduct in an amount to be determined at trial.

## COUNT V

## CIVIL CONSPIRACY

85.    The allegations of Paragraphs 1 through 84 are incorporated herein by reference with the same force and effect as if set forth in full below.

86.    DFA and Griffin formed and operated a malicious combination with a common design to injure Schwab by (a) performing unlawful acts by violating Schwab's contractual, statutory, and common law rights as described above for the unlawful purpose of diverting business and economic gain from Schwab, and/or performing the lawful acts of competing with Schwab and hiring certain of Schwab's personnel, but doing so through the unlawful means of violating Schwab's contractual, statutory, and common law rights as described above.

87.    The foregoing conduct of DFA was malicious, pre-planned, was performed with intent to injure Schwab, and was without justification or privilege. DFA's conduct was undertaken in furtherance of its own personal interests and for its benefit.

88.    DFA and Griffin engaged in overt unlawful acts and conduct violative of Schwab's contractual, common law, and statutory rights as described above, and did so with the knowledge, aid, agreement, and support of one another, causing actual harm to Schwab.

89.    By virtue of the formation and operation of this conspiracy by DFA and Griffin, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Schwab thereby, DFA as a participant in this conspiracy is liable as a joint tortfeasor for each of the above-described acts committed by each co-conspirator.

90.    Because of the foregoing, Schwab has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as

FP 60716887.1

present economic loss and other incalculable financial loss. Schwab has been damaged by DFA's actions in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, because of the foregoing acts and conduct complained of in Counts I through V, Schwab demands judgment in its favor against the DFA, together with the following relief:

A.    An award of damages for such actual losses as may be proven at trial; and/or

B.    an award of damages for unjust enrichment caused by the DFA's unauthorized use or disclosure of Confidential Information and trade secrets belonging to Schwab which are not otherwise addressed in computing actual losses; and/or

C.    in lieu of damages measured by other methods, an award of reasonable royalties for the DFA's unauthorized misappropriation of Schwab's Confidential Information and trade secrets and other intellectual property; and/or

D.    an award of punitive and/or exemplary damages as permitted by law in an amount to be proved at trial;

E.    an award of attorneys' fees, costs, and interest as permitted by law; and/or

F.    an award for prejudgment interest; and/or

G.    an injunction precluding the DFA from continuing to engage in its unlawful conduct and compelling it to purge from its possession, custody and control, and to provide to Schwab all Schwab property; and/or

H.    such other and further relief as this Court deems just and equitable

COMPLAINT

FP 60716887.1

1    Dated: December 10, 2025          FISHER & PHILLIPS LLP

2

3                                 By: _____

4                                      MARISSA M. FRANCO
                                       Attorney for Plaintiff
5                                      CHARLES SCHWAB & CO., INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

FP 60716887.1

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 years, employed in the County of Orange, State of California, and not a party to the within action. I am employed with the law offices of Fisher & Phillips LLP and its business address is 2050 Main Street, Suite 1000, Irvine, California 92614.

On the date below, I served the following document entitled **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** on all the appearing and/or interested parties in this action as follows:

Matthew Henneman                              Attorney for Plaintiff
mhenneman@hkrlaw.com                   CHARLES SCHWAB & CO., INC.
HENNEMAN RAU & KIRKLIN
LLP
815 Walker Street, Suite 1440
Houston, Texas 77002
Telephone: (713) 955-6110
Facsimile: (713) 995-6141

☐ **[by MAIL]** – I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice the enclosed document(s) will be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

☒ **[by ELECTRONIC SUBMISSION]** - I served the above listed document(s) described via the United States District Court's Electronic Filing Program on the designated recipients via electronic transmission through the CM/ECF system on the Court's website. The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

☐ **[by PERSONAL SERVICE]** – I caused the enclosed document(s) to be delivered by messenger by hand to the office(s) of the person(s) whose addressee(s) are listed above. The messenger, employed by First Legal Network, LLC at XXX, is over the age of 18 years and not a party to this action.

☐ **[by ELECTRONIC SERVICE]** - Pursuant to an agreement of the parties to accept service by electronic transmission, I electronically served the document(s) to the person(s) at the electronic service address(es) listed above.

I declare that I am employed in the office of a member of the State of California at whose direction the service was made.

Executed on December 10, 2025, at Irvine, California.

_____
Jessica Zepeda
Jessica Zepeda

1
PROOF OF SERVICE